UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| United States | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | No. 1:18-cr-00457 (AMD) (CLP) |
| | § | |
| Huawei Technologies Co. Ltd., et al., | § | |
| Defendants. | § | |

---

**DECLARATION OF MATTHEW S. BORMAN**

I, Matthew S. Borman, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1.  I am the Principal Deputy Assistant Secretary for Strategic Trade and Technology
    Security, United States Department of Commerce.  I held the position of Deputy
    Assistant Secretary for Export Administration from January 2001 until January 2024,
    when I began my tenure as Principal Deputy Assistant Secretary.  My roles and
    responsibilities in these positions include implementing the Bureau of Industry and
    Security's (BIS) controls on the export of dual-use and military items for national
    security and foreign policy reasons, including protection of human rights, international
    sanctions, and antiterrorism.  In addition, I oversee: BIS's programs to ensure that
    industrial resources are available to meet national and economic security requirements;
    BIS's implementation of the Chemical Weapons Convention; and BIS's implementation
    of the Additional Protocol to the US-International Atomic Energy Agency Agreement.

2.  Since joining the Department of Commerce in 1992, I have served continuously in roles
    involving export control.  Prior to my appointment as Deputy Assistant Secretary, I
    served as Acting Chief of the Enforcement and Litigation Division of the Office of Chief
    Counsel for Export Administration.  As Division Chief, I was responsible for providing
    legal advice to the Export Enforcement unit of BIS, including the adjudication of

1

administrative enforcement actions. I entered the Commerce Department in 1992 as an attorney in the Office of Chief Counsel for Export Administration. As an attorney in that Office, I was responsible for a variety of matters, including General Accounting Office and Office of Inspector General investigations and studies, Freedom of Information Act requests, and export control cooperation with other countries.

3. In these capacities at BIS, I have become familiar with the application of export controls for controlled commodities, software and technology.

4. This declaration is submitted in support of the Government's Response to the Defendants' request for assistance to the Court in the above-captioned case. In particular, I describe the export control licensing process and the harm to the activities of the Department of Commerce if the relief sought were to be granted. The information contained herein is based on my personal knowledge and on information provided to me in my official capacity.

**Bureau of Industry and Security**

5. BIS is an agency within the Department of Commerce headed by the Under Secretary for Industry and Security. BIS controls the export, reexport and in-country transfer of all items subject to the Export Administration Regulations (EAR or Regulations) in accordance with the Export Control Reform Act of 2018, 50 U.S.C. §§ 4801-4852 (ECRA), the successor statute to the Export Administration Act of 1979, as amended, 50 U.S.C. §§ 4601-4623 (Supp. III 2015) (EAA), most of which has now been repealed.

Among other authorities, BIS also regulates certain activities of U.S. persons, wherever located, such as those related to nuclear proliferation.

6.  BIS's mission is to advance U.S. national security, foreign policy, and economic objectives by ensuring an effective export control and treaty compliance system and promoting continued U.S. strategic technology leadership.

7.  As part of its responsibilities, BIS licenses the export, reexport and in-country transfer of items subject to the EAR and seeks to ensure appropriate compliance with and administration of the Regulations.  BIS also maintains, reviews and clarifies the Commerce Control List (CCL) to ensure the appropriate administration of export controls.

8.  Advising BIS's Under Secretary are the Assistant Secretary for Export Administration and the Assistant Secretary for Export Enforcement.  Relevant to this litigation, the Assistant Secretary for Export Administration assists and advises the Under Secretary on the development of policies pertaining to Export Administration issues; provides overall direction to and management of the national security, nonproliferation, foreign policy, national defense, and strategic industrial resource functions delegated to BIS, including the issuance of related regulations.  Department Organization Order (DOO) 50-1, Section 5.01.  As described in the DOO,[1] the Deputy Assistant Secretary for Export Administration serves as the principal deputy to the Assistant Secretary for Export Administration; performs such duties as the Assistant Secretary for Export Administration may assign; and performs the duties of the Assistant Secretary for Export

---

[1] Export Administration has reorganized, including through the recent creation of the Principal Deputy Assistant Secretary for Strategic Trade and Technology Security.  The DOO has not been updated to reflect the reorganization.

Administration during the latter's absence.  DOO 50-1, Section 5.02.  Similarly, the Deputy Assistant Secretary for Export Enforcement serves as the principal deputy to the Assistant Secretary for Export Enforcement and performs such duties as the Assistant Secretary for Export Enforcement may assign and performs the duties of the Assistant Secretary for Enforcement during the latter's absence.  DOO 50-1, Section 6.01-.02.

**Statutory Authority**

9.  Before August 13, 2018, BIS operated under the legal authority of the EAA.  Although the EAA had been in lapse since August 2001, successive administrations kept the EAA and the EAR in effect by executive action.  Specifically, the President, through Executive Order 13222 of August 17, 2001 (3 C.F.R., 2001 Comp. 783 (2002)), which was extended by successive Presidential Notices, continued the Regulations in full force and effect under the International Emergency Economic Powers Act, 50 U.S.C. § 1701, et seq. (2012) (IEEPA).

10.  On August 13, 2018, the President signed into law the John S. McCain National Defense Authorization Act for Fiscal Year 2019, which included ECRA, providing the legal basis for BIS's principal authorities.  ECRA repealed all but Sections 11A, 11B and 11C of the EAA and allows for ongoing agency operations based on a transition provision in Section 1768 of ECRA.  Those sections were continued in effect through a Presidential Notice. *See* 88 Fed. Reg. 55549 (Aug. 16, 2023). Specifically, Section 1768 of ECRA provides that all delegations, rules, regulations, orders, determinations, licenses, or other forms of administrative action that have been made, issued, conducted, or allowed to become effective under the EAA and as continued in effect pursuant to IEEPA and the related Executive Orders and Federal Register notices or the EAR, and were in effect as of

4

August 13, 2018, continue in effect according to their terms until modified, superseded, set aside, or revoked under the authority of ECRA.

11. ECRA includes a number of stated policies of the United States in the context of export controls.  These include using export controls only to the extent necessary to restrict the export of items that would make a "significant contribution to the military potential of any other country… which would prove detrimental to the national security of the United States" or "further significantly the foreign policy of the United States or [its ability] to fulfill its declared international obligations."  50 U.S.C. § 4811(1)(A)-(B).  Further, ECRA states that the "national security and foreign policy of the United States require that the export, reexport and in-country transfer of items, and specific activities of United States persons, wherever located, be controlled" "[t]o carry out the foreign policy of the United States, including the protection of human rights and the promotion of democracy" and "[t]o ensure national security controls are tailored to focus on those core technologies and other items that are capable of being used to pose a serious national security threat to the United States."  50 U.S.C. § 4811(2)(D), (G).

12. To achieve these goals, among others, ECRA authorizes the President to control the "export, reexport and in-country transfer of items subject to the jurisdiction of the United States whether by United States persons or by foreign persons."  50 U.S.C. § 4812(a)(1).  ECRA further directs that, on behalf of the President, the Secretary of Commerce, in consultation with the Departments of State, Defense, Energy and other agencies as appropriate, shall "establish and maintain a list of items that are controlled" and "prohibit unauthorized exports, reexports and in-country transfers of controlled items, including to

foreign persons in the United States or outside the United States."  50 U.S.C. § 4813(a)(1), (a)(3).

13. In addition, ECRA provides authority to impose additional licensing requirements on certain entities of concern.  Specifically, ECRA directs that, on behalf of the President, the Secretary of Commerce, and in consultation with the Departments of State, Defense, Energy and other agencies, as appropriate, "establish and maintain a list of foreign persons and end-uses that are determined to be a threat to the national security and foreign policy of the United States," e.g. the Entity List.  50 U.S.C. § 4813(a)(2).

14. The principles described above in ECRA could also be found in the policies of its predecessor statute, the EAA, and of its implementing regulations, and thus have been a longstanding part of the administration of export controls.  For example, the EAA authorized Commerce to "identify on the control list which goods or technology, and which countries or destinations, are subject to which types of controls…."  50 U.S.C. § 4605(o) (Supp. III 2015).

15. In addition, with limited exceptions, ECRA provides that the functions exercised under Commerce's authority to administer export controls "shall not be subject to sections 551, 553 through 559, and 701 through 706 of title 5."  50 U.S.C. § 4821(a).  Thus, by statute, Commerce's rulemaking process is not subject to the Administrative Procedure Act, and it is not subject to judicial review.  *Id.*

**Regulatory Framework**

*Items Subject to the EAR*

16. The EAR defines the scope of the Regulations in Part 734, identifying the items and activities subject to the jurisdiction of the Regulations as well as identifying items not

6

subject to the Regulations.  For example, "items subject to the EAR" include all items in the United States and all U.S.-origin items, wherever located.  It does not include items within the exclusive jurisdiction of another agency, such as defense articles and services controlled under the International Traffic in Arms Regulations (ITAR) administered by the State Department's Directorate of Defense Trade Control.

17. For items subject to the EAR, the Regulations define what particular activities constitute an export.  With limited exceptions, Section 734.13(a) defines "export" to include:

(1) An actual shipment or transmission out of the United States, including the sending or taking of an item out of the United States, in any manner;

(2) Releasing or otherwise transferring "technology" or source code (but not object code) to a foreign person in the United States (a "deemed export");

18. As is also set forth in Section 734.13(b) of the EAR, "[a]ny release in the United States of 'technology' or source code to a foreign person is a deemed export to the foreign person's most recent country of citizenship or permanent residency."

19. The EAR also includes a specific list of controlled items.  Supplement No. 1 to Part 774 of the EAR sets out the CCL, which describes the technical parameters of commodities, software and technology (collectively referred to as "items") controlled for export, reexport or in-country transfer.  A license may be required for the export, reexport, or in-country transfer of items on the CCL depending on the nature of the items, the specific end use and the end user or destination.  The CCL is organized in categories numbered 0 through 9, which generally correspond with the numbering structure of Wassenaar Arrangement's control list, a multilateral regime of which the United States is a member. Items are identified with an Export Control Classification Number (ECCN), which is an

alphanumerical code that helps identify the origin of the control and the restrictions that may apply.

20. It is important to note, however, that Commerce's jurisdiction extends beyond just the CCL. Specifically, Commerce's jurisdiction under the EAR extends to all items "subject to the EAR." This includes, among other bases for jurisdiction, all items in the United States, all U.S.-origin items, wherever located, and certain foreign-made commodities incorporating controlled U.S.-origin content. 15 C.F.R. § 734.3. Commerce's broad reach over items subject to the EAR allows the agency to implement controls related to U.S. sanctions and embargoes as well as end use and end user restrictions on items not on the CCL. For example, the U.S. implements a comprehensive embargo against Cuba, meaning all items subject to the EAR require U.S. Government authorization for export, reexport or in-country transfer to Cuba. Similarly, as further described below, individuals and entities placed on the Entity List may require a Commerce license for "all items subject to the EAR," depending on the scope of the license requirement. *See* Supplement No. 4 to Part 744 of the EAR.

21. With limited exception, EAR jurisdiction extends only to the export, reexport and in-country transfer of items subject to the EAR and the release of technology to foreign nationals in the United States, often referred to as "deemed exports." 15 C.F.R. § 734.13-15. The EAR does not regulate transactions between U.S. persons (generally including a U.S. citizen, permanent resident or protected individual/asylee) within the United States for domestic use. *See* 15 C.F.R. § 734.18(a)(2).

22. The EAR may require a license or other authorization for the export, reexport or in-country transfer of controlled items, including technology and software. Although

revealing technology to a foreign person, including through oral or visual disclosure, is an export under the EAR, transmitting or otherwise transferring technology or software to U.S. persons in the United States is not an export and is not governed by the EAR.  15 C.F.R. § 734.18(a)(2).

23. For items that require a license to be exported from the United States, "[t]he applicant must be the exporter, who is the U.S. principal party in interest with the authority to determine and control the sending of items out of the United States…."  15 C.F.R. § 748.4(a)(1).  The Regulations further indicate that principal parties in interest are "[t]hose persons in a transaction that receive the primary benefit, monetary or otherwise, of the transaction. Generally, the principals in a transaction are the seller and the buyer. In most cases, the forwarding or other agent is not a principal party in interest."  Id. at § 772.1.

*License Review Process*

24. Where a license is required from Commerce, the license application is subject to a thorough interagency review process as set forth under ECRA as well as the EAR and consistent with Executive Order 12981.  50 U.S.C. § 4814(c); 50 U.S.C. § 4822(c); Executive Order 12981, as amended (60 Fed. Reg 62,981, December 8, 1995).  *See also* 15 C.F.R. part 750.  Consistent with these authorities, the Departments of State, Defense and Energy are authorized to review licenses submitted to Commerce, which allows Commerce to supplement its technical expertise with that of its interagency partners on matters of national security and foreign policy, including regional stability and human rights. The well-established interagency review process ensures that a variety of perspectives and expertise from these U.S. Government agencies, including the intelligence community, are able to inform the Commerce license review process to

ensure only those exports that are consistent with U.S. national security and foreign policy interests will be approved. BIS also has flexibility in how it approves licenses and can include additional safeguards as may be warranted, through, for example, license conditions.

*Statutory and Regulatory Penalties*

25. In relation to enforcement, ECRA and the EAR provide for criminal and civil penalties for violations of the Regulations, including for unauthorized exports, reexports and in-country transfers. EAR enforcement decisions are made on a case-by-case basis depending on the particular facts of a case. Civil penalties may include a monetary penalty, denial of export privileges and other remedial actions.

**Interagency Process for Adding Entities to the Entity List**

26. The process to add, amend, or remove entries from the Entity List is described in Supp. No. 4 to part 744 of the EAR. Consistent with those procedures, the End-User Review Committee (ERC), composed of representatives of the Departments of Commerce, State, Defense, Energy and, where appropriate, the Treasury, make all decisions to make additions to, removals from, or changes to the Entity List. The ERC is chaired by the Department of Commerce. All decisions to add an entry to the Entity List are done by majority vote and all decisions to remove or modify an entry by unanimous vote.[2] The Department of Justice has no role in this process.

---

[2] Congress has also mandated that Huawei may not be removed from the Entity List absent a certification to Congress by the Secretary of Commerce. *See* National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, § 1260I, 133 STAT. 1198, 1687 (2019).

27. When determining to add an entity to the Entity List or to modify an existing entry, the ERC will also specify the section or sections of the EAR that provide the basis for that determination.  Any agency that participates in the ERC may make a proposal for an addition to, modification of, or removal of an entry from the Entity List by submitting that proposal to the chairperson.

28. The Entity List imposes licensing requirements in addition to those found elsewhere in the Regulations, and provides additional restrictions, such as limitations on the use of license exceptions.[3]  As a result, even if there is no license requirement for an item destined to China, for example, a license may be required for the same item destined to an entity on the Entity List located in China.  Similarly, a license may be required both because of the country of destination and the involvement of an entity on the Entity List, and with different national security or foreign policy considerations.

**Huawei's Addition to the Entity List**

29. On May 16, 2019, BIS added Huawei Technologies Co., Ltd. (Huawei) and certain non-U.S. affiliates to the Entity List.[4]  As a result of the listing, additional licensing requirements were imposed on exports, reexports, and transfers (in-country) of all items subject to the EAR destined to or involving the listed Huawei entities when such entities acted as a purchaser, intermediate consignee, ultimate consignee, or end user.[5]  In

---

[3] 15 C.F.R. § 744.11.
[4] See 84 Fed. Reg. 22961 (May 21, 2019) (adding Huawei and 68 of its non-US affiliates to the Entity List effective May 16, 2019), 84 Fed. Reg. 43493 (Aug. 21, 2019) (adding 46 additional Huawei entities and amending other entries), and 85 Fed. Reg. 51596 (Aug. 20, 2020) (adding 38 additional Huawei entities to the Entity List).

[5] 15 C.F.R.  § 744.11.

addition, many of the items on the Commerce Control List required a license for export to China prior to Huawei's 2019 listing on the Entity List.[6]

30. The Entity List designation was based on a determination made by BIS and multiple government agencies represented on the ERC "that there is reasonable cause to believe that Huawei has been involved in activities contrary to the national security or foreign policy interests of the United States."[7]  Further, the ERC determined that non-U.S.-affiliates of Huawei should be added to the Entity List because they "present a significant risk of acting on Huawei's behalf to engage in such activities."  In the Federal Register notices adding Huawei to the Entity List, BIS cited a 2019 superseding criminal indictment in the U.S. District Court for the Eastern District of New York, charging Huawei with 13 counts of violating U.S. law ("Superseding Indictment").

Huawei's Entity List listing noted that the Superseding Indictment alleged that "Huawei and an Iranian based affiliate, working with others, knowingly and willfully conspired to impair, impede, obstruct, and defeat, through deceitful and dishonest means, the lawful government operations of [the Treasury Department's Office of Foreign Assets Control] OFAC."[8]  In addition, the Entity List listing referenced criminal allegations involving violations of the International Emergency Economic Powers Act[9] and OFAC regulations and conspiring "to cause the export, reexport, sale and supply, directly and indirectly, of goods, technology and services (banking and other financial services) from the United States to Iran and the Government of Iran" without obtaining the required authorization.[10]

---

[6] See, e.g., 15 C.F.R. Supp. No. 1 to part 738 (denoting licensing requirements for China for all items on the Commerce Control List other than those items controlled for reasons related to the Firearms Convention or Anti-Terrorism).
[7] See 84 Fed. Reg. 22961.
[8] Id.
[9] See 50 U.S.C. § 1701 et seq.
[10] See 84 Fed. Reg. 22961.

31. In a pair of rules issued in May and August 2020, BIS also imposed restrictions on the foreign produced direct product ("FDP") of certain U.S. software and technology.[11]  The rules were issued in response to continued national security and foreign policy concerns regarding Huawei and its affiliates.  As a result, certain foreign produced products may be subject to the EAR if destined to a listed Huawei entity or where Huawei was a party to the transaction.[12]

**Huawei Requests Worldwide Authorization but Inaccurately States Applicable Laws**

32. In July 2022, Huawei's counsel requested authorization from BIS for "the release of any technology and software subject to the EAR to [Huawei and Huawei Device USA, Inc.] employees, contractors, witnesses, experts, non U.S.-counsel, or other non-U.S. persons involved in the defense of the proceedings…."[13]  Huawei's counsel also requested authorization to release all technology and software subject to the EAR to persons apparently unrelated to Huawei and largely unidentified in the request for authorization: "Any of Huawei's vendors, contractors, and service providers (whether in the United States or abroad, such as in China and Hong Kong)… [and] Any of the indicted or non-indicted alleged co-conspirators, witnesses, experts, or other third parties in the Proceedings and the outside counsel thereof, whether in the United States or abroad…."[14] In sum, the letter from Huawei's counsel requested authorization to export, reexport, or transfer (in-country) any and all technology and software subject to the EAR to any country in the world and to any person, regardless of the sensitivity of the technology or

---

[11] *See* 85 Fed. Reg. 29849 (May 19, 2020) and 85 Fed. Reg. 51596 (Aug. 20, 2020).
[12] 15 C.F.R. § 734.9(e)(1) (requiring a license for those entities with a footnote 1 designation on the Entity List).
[13] Letter to BIS, dated July 8, 2022, page 2.
[14] Id. at 4.

software and without reference to the national security and foreign policy concerns regarding the countries or individuals and entities of destination.

33. The request also contained several misstatements of the law.  For example, the request asked for authorization to release all technology and software subject to the EAR to "prosecutors from [the Department of Justice], including but not limited to the U.S. Attorney's Office for the [Eastern District of New York], the Money Laundering and Asset Recovery Section of the Criminal Division, and the Counterintelligence and Export Control Section of the National Security Division… and the Court or any person acting for and on behalf of the Court or as part of the criminal proceedings, such as courtroom deputies, clerks, stenographers, jurors, and court security officers, among others."[15] Absent the involvement of a foreign person, however (and the request did not identify any foreign persons in this group), none of these domestic transactions are exports.[16] Thus, no license or authorization is required—indeed, BIS lacks jurisdiction to grant such an authorization.[17]

34. Huawei's counsel also misstated export control laws applicable to the Entity List:

> Consequently, the EAR BIS Entity List restricts the following persons from exporting controlled technology and software to Huawei, to China, and to other non-U.S. persons that may be involved in the Proceedings, as well as restricts Huawei, persons in China, and non-U.S. persons involved in defense of the Proceedings from receiving, inspecting (visually or otherwise), or transferring via third countries or within China controlled items subject to the EAR to be used for criminal defense preparations unless specifically licensed by BIS….[18]

---

[15] Id. at 4.

[16] 15 C.F.R. § 734.18(a)(2) (noting that "[t]ransmitting or otherwise transferring "technology" or "software" to a person in the United States who is not a foreign person from another person in the United States" is not an export).

[17] 50 U.S.C. § 4812(a)(1) (providing the authority to regulate the export, reexport, and in country transfer abroad of items subject to U.S. jurisdiction).

[18] Letter to BIS, dated July 8, 2022, at 4.  [Is this one of the attachments to Huawei's motion?  If so, let's cite it]

35. This is an inaccurate summary of the EAR.  The Entity List, as described *supra* in paragraph 28, imposes export restrictions only on the entity that is on the Entity List; the Entity List does not impose any restrictions to entire countries or all other non-U.S. persons.  Similarly, contrary to the statement from Huawei's counsel, the Entity List does <u>not</u> impose any restrictions on "persons in China, and non-U.S. persons involved in the defense of the Proceedings from receiving, inspecting (visually or otherwise), or transferring via third countries or within China controlled items subject to the EAR" (unless any of those persons are themselves separately listed on the Entity List).  Simply put, the Entity List only imposes a license requirement when the export is destined to an entry on the Entity List or where such an entry is a party to the transaction—and even then, only if the commodity, software, or technology is specified in that entry's Entity List listing.[19]

36. Nonetheless, Huawei's counsel requested authorization to export, reexport, or transfer (in-country) any and all technology and software subject to the EAR to any person or country in the world.

**Background on Previous Litigation Authorizations Granted to Huawei**

37. BIS recognizes the importance of Huawei's ability to prepare and defend itself at trial as evidenced by the issuance of multiple authorizations for this purpose.  Since Huawei's May 2019 listing on the Entity List, BIS has issued ten authorizations granting Huawei's counsel authority to release technology or software to listed Huawei entities in the context of litigation.  Many of these requests were provided to BIS with a request for

---

[19] 15 C.F.R. § 744.11(a).

expedited treatment in light of near-term litigation deadlines.  In accordance with those requests, BIS issued letters of authorization without requesting that Huawei's counsel formally apply for a license.  In each of those requests, Huawei identified the technology or software that was the subject of the request by the applicable Export Control Classification Number (ECCN),[20] including three authorizations requested by Huawei counsel in this litigation.

38. On July 6, 2020, in response to a letter dated July 3, 2020, from Huawei's counsel referencing the instant litigation, BIS authorized "the release of the enclosed list of representative technical document types enclosed as exhibit 7 of your [counsel's] letter and controlled under Export control Classification Numbers EAR, 3E991, 3A99a, 5E991 and 5A991."  On October 23, 2020, in response to a letter dated August 26, 2020, from Huawei counsel again referencing the instant litigation, BIS authorized Huawei counsel to release to Huawei "representative examples of software and technology enclosed as exhibit A of your letter controlled under Export Control Classification Numbers EAR99, 5E991, 5D992, and 3E991…."  On August 11, 2021, in response to a letter dated May 20, 2021, from Huawei counsel again referencing the instant litigation, BIS authorized the release of "the release of EAR99-designated technology or software, and items controlled under ECCNs 5E991, 5D992, 5E992, and 3E991," the ECCNs of which were identified by Huawei's counsel by email on June 9, 2021.  As the above indicates, in all previous requests for authorization, including three requests related to the instant matter, Huawei's counsel identified the pertinent ECCNs for the technology and software that was the subject of the request.

---

[20] The Export Control Classification Number is the five-digit series that identifies commodities, software, and technology (or items) on the Commerce Control List.  See 15 C.F.R. § 738.2(d)(1).

39. In response to all three previous requests by counsel related to this case, BIS acted expeditiously to grant the authorizations following a determination by BIS that the agency could authorize the release consistent with U.S. national security and foreign policy concerns.  One of those authorizations was issued within one business day of the request.[21]

40. To assist Huawei's counsel in obtaining a fourth authorization for this litigation, there were multiple virtual meetings between BIS staff and Huawei counsel starting even before Huawei counsel's formal request of July 8, 2022.  The goal of those meetings was to correct misunderstandings about the EAR and assess if there was an authorization that would satisfy Huawei's new litigation needs without undermining U.S. national security and foreign policy concerns. BIS made multiple requests for Huawei to identify the ECCNs pertinent to the request; Huawei's counsel declined.  BIS staff and counsel explained the agency's concerns that Huawei's request would allow for worldwide release, a step the agency has never taken, which would be problematic considering the Government's ongoing national security and foreign policy concerns about the requester.

41. After multiple meetings and discussions spanning over a year, Huawei agreed to slightly amend its request to exclude releases to Belarus, Cuba, Iran, North Korea, Syria, the Russian Federation, and certain regions in Ukraine, and further agreed that no releases would be made for purposes of collateral attack.[22]  On June 8, 2023, however, Huawei's counsel reiterated that aside from the exclusions above, counsel was requesting "the full scope of our July 8, 2022 written authorization request," which as noted above asked the

---

[21] Huawei's counsel requested an authorization related to this matter dated Friday, July 3, 2020, which was a federal holiday that year.  BIS issued the authorization on Monday, July 6, 2020.

[22] See Letter to BIS, dated June 8, 2023, at 3.

agency to approve releases outside of its jurisdiction, misstated the applicable laws, and failed to identify the technology or software.[23]  Regarding the latter, unlike all Huawei's prior requests for authorization, Huawei's counsel did not provide a list of the technology or software or identify the relevant ECCN.  Instead, Huawei's counsel requested authorization from BIS "consistent with" the Court's Protective Order.[24]

**BIS's October 2023 Authorization for Exports to Huawei**

42. On October 30, 2023, BIS issued a fourth letter to Huawei's counsel authorizing further releases for purposes of this litigation.  That letter authorized the export, reexport, or transfer (in-country) of the following to Huawei and its affiliates listed on the Entity List: any technology or software designated as EAR99 or controlled on the Commerce Control List in Supp. No. 1 to part 774 of the EAR for Anti-terrorism (AT) reasons[25] only; any technology or software that is the attorney work product of Huawei's attorneys, both in-house and outside counsel; and any technology or software that is treated as "Sensitive Discovery Material" consistent with the Court's Protective Order.

43. Pursuant to the October 2023 authorization, Huawei's counsel may export to listed Huawei entities in China (or elsewhere) any technology or software designated as EAR99 or controlled for AT reasons only as well as any technology or software contained in attorney work product for Huawei's defense in this litigation.  Huawei personnel need not travel outside of China to receive that technology or software from their counsel if related to this litigation.

---

[23] Id.

[24] Id.

[25] Each ECCN is accompanied by a reason for control from most to least restrictive.  Some ECCNs have multiple reasons for control, which may impose different license requirements for different countries for the same item.  AT controls are the least restrictive, meaning that it requires a license for a fewer number of countries and destinations than most other reasons for controls.  See 15 C.F.R. § 738.2(d)(2)(ii).

44. Because no technology or software was identified by Huawei's counsel, by ECCN or otherwise, the remainder of the authorization required that all other technology or software was authorized for release to Huawei if treated as "Sensitive Discovery Material," pursuant to the Court's Protective Order.  In particular, release was authorized if consistent with the Protective Order's mandate that the technology or software "shall not under any circumstances be taken, transmitted or accessed, in whole or in part, outside of the United States of America."  The October 2023 authorization stated that any other releases of technology or software required an additional BIS authorization.

45. The October 2023 authorization, which in keeping with the request from Huawei's counsel was consistent with the Protective Order, was the broadest litigation-related authorization issued to Huawei to date.  The letter authorized the release of large amounts of technology or software to Huawei for purposes of this litigation, including releases to Huawei abroad.  The release encompassed all ECCNs contained in the three previous requests among others.

**Huawei's Renewed Request for Near Worldwide Release of all Technology and Software**

46. In January 2024, Huawei contacted BIS to request authorization for any technology or software that was not authorized for release to Huawei outside of the United States by the October 2023 authorization.  In response, BIS informed Huawei's counsel that if additional authorization was required (beyond the four authorizations already issued), counsel should apply for a license using the procedures described in the EAR.

47. Huawei's counsel subsequently filed a license application related to the instant litigation. The application did not identify any specific technology or software that fell outside the October 2023 authorization.  Instead, the license application identified nearly every

ECCN on the Commerce Control List.  The request was for "authorization for the release of *all* technology ECCNs, other than those under "600" series, any ECCN for which the last three numerals are 018, 9x515 series, and Missile Technology ("MT") controls."[26] That list included items clearly unrelated to the litigation such as firearms technology, which was the first ECCN listed on the license application.  Huawei's counsel declined to identify any specific technology or software, even technology or software that counsel examined and concluded could be controlled for reasons other than AT.[27]  Because the application did not identify the relevant ECCN or include a copy of the technology, BIS could not assess the technology to confirm the ECCN or make a national security or foreign policy determination about the release.

48. The sole rationales offered by Huawei's counsel as to why the near worldwide authorization was necessary and warranted related to materials from DOJ.[28]  Counsel's letter of explanation, however, made clear that the requested authorization was not only with respect to the documents provided by DOJ, but by any third parties:  "all other materials obtained or generated from sources other than the [G]overnment related to defense of the Proceedings, including materials and information provided by third parties; percipient and expert witness statements and testimony; and evidence of other information obtained or prepared by the U.S. Legal Team or others participating in the

---

[26] Letter to BIS, dated Feb. 8, 2024, at 7 (emphasis in the original).

[27] See Letter to BIS, dated Feb. 8, 2024, at 5 (Huawei counsel stated that it "believes [that] some documents may contain technology (including scans of documents containing software or source or object code) controlled under stricter ECCNs, such as those subject to National Security," but counsel's application did not identify the relevant ECCN or include a copy of the technology.).

[28] Id.5-6 ("DOJ has produced voluminous discovery that appears to contain technology subject to the EAR…. Because DOJ has produced such a large number of documents….  Moreover, it would be infeasible for the [Huawei's] U.S. Legal Team to review the millions of pages of documents now produced by DOJ….  [I]t is impractical from a criminal defense perspective to undertake a technology review for the discovery materials produced or to be produced by DOJ….").

defense of the Proceedings."[29]  The request did not identify the technology or software obtained from third parties, omitted an assessment as to why counsel believed those materials may be subject to the EAR, and did not provide an explanation as to why a near worldwide release was warranted for those items.

49. As noted *supra* in paragraph 47, the application's letter of explanation also narrowed the ECCNs requested for release.[30]  That limitation, however, undermines counsels' assertions that they could not assess the technology or software themselves[31] and the implied assertion made through their application, that they could be responsible for ensuring against unauthorized diversion or release of the technology or software.  That is, even if BIS had issued the authorization as requested in the application dated February 8, 2024 (requesting authorization for all but specified ECCNs), Huawei counsel would have to do what it says it lacks the expertise and resources to do:  assess, document-by-document, which technology and software was actually approved for release.

50. The license application from Huawei's counsel was returned without action on March 29, 2024, because it failed to provide: documentation of the technology being requested for export to Huawei; a justification for requesting technology ECCNs that are not related to telecommunications (if any); and information on how the technology listed on this license will be safeguarded and protected from unauthorized disclosure and/or release to unauthorized end users and end uses.

---

[29] Id. at 7.

[30] The amended request was for all technology other than those under "600" series, any ECCN for which the last three numerals are 018, 9x515 series, and Missile Technology ("MT") controls."  Id.

[31] Id. at 6 (asserting that "it would be infeasible for the U.S. Legal Team to review the millions of pages of documents now produced by DOJ to determine if such materials fall within the scope of the current BIS license approvals.  In addition to being costly and burdensome, because these documents are not Huawei's records, the U.S. Legal Team would not have access to sufficient information and technical expertise to conduct an export review for ECCNs of another party's technology.").

**Likely Effects of the Relief Sought by Huawei**

51. Huawei's counsel has not specifically identified the relief sought from the Court[32] but is implicitly suggesting that the Court decide that export licensing restrictions are unnecessary beyond any restrictions already proscribed by the Court's Protective Order.[33] Huawei counsel's argument that the Court's Protective Order "by its own terms, is supposed to be the exclusive source of restrictions on Huawei's access to discovery materials" is undermined by the fact that Huawei's attorneys very clearly understood differently—hence their outreach to BIS in July 2022 to request authorization for the release, their subsequent license application in January 2024, and the discussions with BIS in the long interim.

52. In addition, a determination by the Court that an export control authorization from BIS is made irrelevant by the Court's Protective Order would undermine BIS's statutory authority to regulate export controls pursuant to U.S. national security and foreign policy concerns as well as the ability of BIS's interagency partners to review and assess any license application.  Consistent with the licensing review process outlined supra in paragraph 24, all license applications to export, reexport, or transfer (in-country) items destined to or involving Huawei are reviewed by the Departments of Commerce, Defense, State, and Energy.

53. That licensing process, pursuant to Executive Order 12981, as amended, provides for the possibility of multiple levels of review amongst the agencies to assess whether licenses

---

[32] Letter to the Court, dated June 14, 2024, at 9 (requesting "the Court's assistance in resolving these issues" without specifying the method of relief).
[33] Letter to the Court, dated June 14, 2024, at 1 (asserting that "The Court's P.O. in this case, by its own terms, is supposed to be the exclusive source of restrictions on Huawei's access to discovery materials.").

should be approved including up to the President.[34]  That process starts at the staff level. Agencies that disagree with the licensing decision may escalate the license application to review by senior career officials at the reviewing agencies, then to Presidentially-appointed, Senate-confirmed officials at the Departments of Commerce, Defense, State, and Energy, then to Cabinet members of those agencies, and then the President, who would make the final determination if interagency agreement could not be achieved.  A determination that Huawei counsel need not apply for a license application and could instead rely exclusively on the Court's Protective Order, would prevent those interagency deliberations on whether to grant such a license and what, if any, conditions should attach to such an authorization.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 15, 2024.

_____

Matthew S. Borman

---

[34] See § 5(b) of E.O. 12981, as amended.